UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Rigoberto Jesus Garcia,

Petitioner,

vs. REPORT AND RECOMMENDATION

T.C. Peterson, Warden,
F.C.I. Sandstone,

Respondent. Civ. No. 00-467 (PAM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 20th day of November, 2000.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, see Title 28 U.S.C. §2241. The Petitioner appears pro se, and the Respondent has appeared by Eric P. Johnson, Assistant United States Attorney.

For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be dismissed.

## II. Factual and Procedural History

The Petitioner is presently serving a 151-month Federal prison term, which was imposed by the United States District Court for the Southern District of Florida on December 10, 1993. The Petitioner

NOV 20 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD

was sentenced following his conviction for conspiracy to distribute and possess, with an intent to distribute cocaine, in violation of Title 21 U.S.C. §§846, and 841(a)(1).

On August 2, 1995, the Petitioner was assigned to the Federal Prison Camp in Pensacola, Florida. See, Declaration of Angela Buege, at ¶ 4. In January of 1999, the Petitioner received an Incident Report, which charged him with Being in an Unauthorized Area, Code 316, and with Introduction/Possession of Non-Hazardous Contraband, Code 331. Id. As a result of this Incident Report, the Prison Unit Discipline Committee conducted a Hearing, and referred the matter to a Discipline Hearing Officer ("DHO"). Id. The DHO acquitted the Petitioner of the charged offenses, and expunged the Incident Report.[1] However, despite the lack of a conviction, the Petitioner was transferred to the Federal Prison Camp in Eglin, Florida ("F.P.C. Eglin") on February 17, 1999. Id. Although the Petitioner claims that this transfer was intended as retaliation for his acquittal, the Respondent contends that it resulted from a determination that the Petitioner may have been involved, to some degree, in the cited charges, and therefore, the

[1]The expungement of the Petitioner's Incident Report was because of a break in the chain of evidence, the lack of the seized contraband, and the absence of corroborative evidence to support the Prison's claim that the Petitioner was located in and out of bounds. See, Declaration of Angela Buege, at ¶ 4.

transfer was effectuated to "maintain the security and orderly running of the institution * * *." Government's Response to Petition for Writ of Habeas Corpus, at 3, citing Buege Dec., at ¶ 4.

On April 14, 1999, while located at F.P.C. Eglin, the Petitioner was charged with violating several prison Regulations, including: (1) Lying or Providing a False Statement, Code 313; (2) Receiving Anything of Value From Another Inmate, Code 328; and (3) Unauthorized Contact with the Public, Code 327. See, Petitioner's Appendix in Support of Petition for Writ of Habeas Corpus, at A4-A6. As a result, the Unit Discipline Committee, at F.P.C. Eglin, conducted a Hearing, and referred the matter to a DHO. Id.

Prior to the Hearing before the DHO, which was held on April 27, 1999, the Petitioner professed his desire to be represented, at the Hearing, by staff representative Shannon Steele ("Steele"). Id. at A7. Thereafter, according to the Petitioner, he requested that staff member Keith Bufford ("Bufford") represent him at the Hearing. However, despite these requests, neither Steele, nor Bufford, was appointed to represent the Petitioner, because of their purported unavailability. Id. at A8. Instead, staff representative Ron Porter ("Porter") was appointed to represent the Petitioner. Id. Subsequently, at the Hearing, Porter represented to the DHO, as follows:

> [The] [r]equested staff representative declined or could not appear but [the] inmate was advised of [the] option to postpone [the] hearing to obtain another staff representative * * *.
>
> * * *
>
> Mr. Porter indicated he had an opportunity to meet with Inmate Garcia prior to the DHO hearing and they were ready to continue. Mr. Porter indicated he reviewed the inmate discipline packet and noted no due process violations.
>
> Mr. Porter indicated that lesser sanctions were imposed at the UDC level on the other inmates involved in this case * * * suggesting that it may be appropriate for the DHO to consider similar sanctions.

Id.[2]

During the Hearing, the Petitioner admitted that he used the prison telephone while employing the access codes of inmates Raul Iparraguirre ("Iparraguirre") and Harvey Ward ("Ward"). Id. at A9. In addition, the Petitioner admitted that, prior to the alleged misconduct, he signed a document stating that he could not give up his phone access code. Id.

However, in his defense, the Petitioner argued that: (1) he did not know that he was prohibited from speaking on the phone

[2]The Petitioner contends that he challenged the appointment of Porter, that he requested a postponement of the Hearing, and that he specifically requested to be represented by another staff representative, Keith Bufford. However, there is no evidence in the Record before us to support these contentions.

while using another inmate's access code; (2) Ward and Iparraguirre did not divulge their access codes to the Petitioner, but rather, keyed them into the telephone, before passing the telephone to the Petitioner; and (3) he did not view Ward's, and Iparraguirre's, transmission of their access codes, as constituting a violation of telephone security or of the phone access system. Id. Further, at the Hearing, testimony was elicited from Ward, who stated as follows:

> Yes, I did place a call to an ex-inmate by the name of Chip Guest. You see, Chip Guest was to send me a subscription to the National Enquirer and $50. Chip Guest had been avoiding me and not accepting my calls. So I put Ricky Garcia on the phone so that Ricky could persuade Chip Guest to send me the newspaper and the $50. Is there something wrong with this?

Id.[3]

At the conclusion of the Hearing, the DHO found the Petitioner guilty of Receiving Anything of Value From Another Inmate.[4] Id. at

---

[3]At the Hearing, the Petitioner also requested that Iparraguirre be called to testify. Apparently, Iparraguirre was expected to testify that he dialed a telephone number, using his own access code, and then handed the telephone to the Petitioner, in the same manner that was described by Ward. See, Petitioner's Appendix, at A9. However, the DHO choose not to call Iparraguirre as a witness, because of his opinion that the expected testimony would serve no useful purpose, as it was identical to that which had been proffered by Ward. Id.

[4]The DHO expunged, from the Record, the other purported violations of the Petitioner, because of his opinion that they were repetitive of the act of Receiving Anything of Value From Another (continued...)

A10-A13. This decision was assertedly supported by a variety of evidence, including a report from a prison official which indicated that: (1) the official had become aware of the incident at the conclusion of an investigation, which revealed that the Petitioner utilized the telephone access codes of two other inmates, and thereby received something of value from those inmates; and (2) there was no evidence, on the recordings of the alleged conversations, which indicated that the phone receiver had been passed from one individual to another, or that Ward or Iparraguirre were present during the alleged conversations. Id. at A10-A11.

Moreover, as outlined by the DHO:

> [The prison official introduced] documentary evidence in the form of Program Statement 5264.06, dated December 22, 1995. * * * [T]his document provides language that inmates are permitted to submit telephone numbers, subject to approval by the Bureau of Prisons, which may be subsequently added to an authorized telephone list. * * * [T]his program statement further addresses telephone access codes and further describes that inmates may not possess another inmate's telephone access code number nor may that inmate give his telephone access to another inmate. * * * [T]his program statement further describes that telephone access is considered an item of value for the purpose of inmate discipline. Program Statement 5264.06 further states that giving to another inmate or the possessing of another inmate's phone access falls within the Moderate cate-

---

[4](...continued)
Inmate. See, Petitioner's Appendix, at A12.

> gory level of prohibited acts. The DHO notes reviewing an Admissions and Orientation Program Checklist, on which Rigoberto Garcia acknowledges receiving briefings regarding telephone access codes and that during these briefings, BOP staff member Leroy McRae verbally advised that compromising telephone access could result in an incident report. The DHO notes Mr. Leroy McRae verbally advised Rigoberto Garcia on March 2, 1999, regarding the use of the inmate telephones. The DHO further notes Rigoberto Garcia acknowledged receipt of the precautionary comments provided by Mr. Leroy McRae during the Admissions and Orientation lectures.

Id. at A11.

According to the DHO, this evidence, and the testimony that was provided by the Petitioner, and Ward, established that the Petitioner was guilty of "compromis[ing] the integrity of the inmate telephone system by participating and utilizing other inmates' telephone access." Id. at A12.

The DHO specifically noted that, although the Petitioner claimed to be unaware that his alleged use of the telephone system was prohibited, this defense was implausible, because the Petitioner acknowledged receiving the lectures given by Mr. Leroy McRae as a part of the Admission and Orientation program, during which telephone procedures were discussed. Id. As such, the DHO concluded as follows:

> [A]ny reasonably thinking inmate most certainly knows that within any correctional facility extensive security procedures are in place, to include the taping of telephone conversations,

> to ensure that inmates are appropriately identified before they employ the use of the inmate telephone system. * * * These security procedures include specific inmate telephone access codes * * * [that] are compromised at the very moment one inmate surrenders his telephone access to another.

Id.

Based on the Petitioner's conviction, the DHO imposed the sanction of 14 days disciplinary segregation, and recommended a disciplinary transfer.[5] See, Id. In support of this sentence, the DHO noted that the Petitioner's conduct revealed the presence of behavioral problems. Id. at A13. As such, the DHO concluded that the Petitioner needed to be placed in a environment with more structure and control than that afforded by an open camp prison environment. Id.

In addition, the DHO noted that the evidence surrounding the Petitioner's violation suggested numerous instances in which prison security procedures were compromised, and he reported that he viewed the Petitioner's role in the alleged violations as more culpable, than that of Ward and Iparraguirre, due to the Petitioner's "increased role as a 'persuader', who was to, in effect, extort money from individuals who have been released from BOP custody * * *." Id. As such, the DHO determined that significant

[5]The DHO suspended the segregation portion of the Petitioner's sentence, pending 180 days of clear behavioral conduct. See, See, Petitioner's Appendix in Support of Petition for Writ of Habeas Corpus, at A13.

sanctions were needed, in order to deter the Petitioner, and others at F.P.C. Eglin, from engaging in behavior of the same sort. Id.

As a result of the DHO's determination, the Petitioner was transferred, on June 10, 1999, to the Federal Correctional Institution, in Sandstone, Minnesota ("F.C.I. Sandstone"). See, Buege Dec., at ¶ 11.[6] Thereafter, the Petitioner appealed the DHO's finding of guilt, as well as the sanctions imposed, to the Regional Director of the North Central Regional Office. See, Petitioner's Appendix, at A14-A15. His appeal was denied on August 28, 1999. Id. at A16.[7]

In addition to appealing the DHO's decision, on August 25, 1999, the Petitioner submitted a Request for Administrative Remedy, asking that his security classification at F.C.I. Sandstone be changed from Minimum In, to Minimum Out, and that his responsibility rating be changed from poor, to average or good. Id. at A60. On September 8, 1999, this request was denied by the Respondent, who stated, as follows:

---

[6]While incarcerated at F.P.C. Eglin, the Petitioner's security level classification was Minimum but, because of his transfer to F.C.I. Sandstone, the Petitioner was classified with a management variable of greater security. See, Buege Dec., at ¶¶ 12-13.

[7]On September 3, 1999, the Petitioner appealed the Regional Director's decision to the Central Office. See, Petitioner's Appendix, at A17. This appeal was denied on November 10, 1999. Id. at A18.

> An investigation into this matter reveals that your current custody level is appropriate as evidenced by you receiving a disciplinary transfer from F.P.C. Eglin, Florida, due to misconduct while having OUT custody. The responsibility rating of "poor" on your Custody Classification Form is appropriate. An assessment of your demonstrated level of responsibility within the last twelve months indicates misconduct while in a minimum security setting resulting in a disciplinary transfer.
>
> * * *
>
> In view of the above, there is no basis for relief; and your request is denied.

Id. at A61.

Subsequently, the Petitioner appealed the Respondent's decision to the Regional Director. Id. at A62-A63. However, during the time in which that appeal was pending, institutional staff reevaluated the Petitioner's classification, and returned his custody level to Minimum Out. Id. at A64. Consequently, the Regional Director upheld the classification portion of the Petitioner's appeal. Id. However, because the Petitioner failed to present sufficient evidence to support his contention, that the assessment of the prison staff was inaccurate, the responsibility rating portion of his administrative appeal was denied.[8] Id.

---

[8]The Petitioner appealed the Regional Director's decision to uphold the Respondent's responsibility rating on November 2, 1999. See, Petitioner's Appendix, at A65-A66. This appeal was denied by the Administrator of National Inmate Appeals on December 12, 1999. Id. at A67. In addition, the Petitioner directed a litany of other (continued...)

The Petitioner filed his Habeas Petition on March 2, 2000. At that time, the Petitioner's specific allegations were as follows: (1) that the prison rule, which the Petitioner is alleged to have

---

[8](...continued)
appeals, to the Respondent, to the Regional Director, and to the Central Office. For example, the Petitioner submitted a Request for Administrative Remedy on August 25, 1999, asking that the management variable, which was placed on his security rating for disciplinary purposes, be removed. Id. at A70. This appeal was denied by the Respondent on September 8, 1999. Id. at A71. Thereafter, subsequent appeals were denied by the Regional Director on October 12, 1999, and by the Central Office on December 22, 1999. Id. at A72-A77.

On November 5, 1999, the Petitioner submitted a Request for Administrative Remedy, at the institutional level, alleging Due Process violations with respect to his disciplinary transfer, and requesting a transfer back to a Minimum security institution. Id. at A88. This appeal was denied by the Respondent on November 18, 1999. Id. at A90. Thereafter, the Petitioner appealed to the Regional Director on November 20, 1999, Id. at A91, and this appeal was denied on December 15, 1999. Id. at A92. Also, as related by the Respondent, although the Petitioner appealed this decision to the Central Office, his appeal was denied, as repetitive. See, Government's Response, at 8.

On December 15, 1999, the Petitioner submitted a Request for Administrative Remedy, at the institutional level, requesting a review of his transfer, alleging that it was effectuated on the basis of falsified findings. Id. at A83. On January 7, 2000, the Respondent denied this request. Id. at A84. In addition, on December 16, 1999, the Petitioner submitted a Request for Administrative Remedy, at the institutional level, requesting an alteration of his Central Inmate Monitoring Assignment. See, Petitioner's Appendix, at A97. This request was denied by the Respondent on January 5, 2000. Id. at A99. Thereafter, the Petitioner appealed this decision to the Regional Director, and that appeal was denied on January 26, 2000. Id. at 102. The Petitioner's appeal to the Central Office, with respect to this issue, was pending at the time he filed his Habeas Petition.

violated -- namely, Receiving Anything of Value From Another Inmate -- is vague, and over-broad and, therefore, failed to provide him with adequate notice that his conduct was prohibited, in violation of his Fifth Amendment right to Due Process; (2) that the Petitioner's Due Process rights were violated when he was denied the opportunity to present his defense at the Discipline Hearing; (3) that Bureau of Prison ("BOP") officials retaliated against the Petitioner for exercising his constitutional rights, by seeking a disciplinary transfer, and (4) that the Petitioner was denied the equal protection of the laws, in violation of the Fifth and Fourteenth Amendments, by the BOP's assignment of certain prison classifications. Based upon these allegations, the Petitioner requests that an Evidentiary Hearing be conducted, in order to develop additional evidence in support of his constitutional claims.

In his response to this Petition, the Respondent notes that, because the Central Office had yet to act on two of the Petitioner's appeals, prior to the filing of this Habeas Petition, the Petitioner has failed to completely exhaust his administrative remedies. However, the Respondent requests that we overlook these procedural deficiencies, and that we dismiss the Petitioner's claims, on their merits, because of the compelling probability that the Central Office's decision will have been rendered, while the Petition has pended. Alternatively, the Respondent argues that,

even though the Petitioner had not exhausted his administrative remedies, at the time that he filed his Petition, it would be futile to dismiss his Petition on that basis, as he could simply refile the Petition, when his administrative remedies should be exhausted. Given the circumstances presented, we accede to the Respondent's request that we proceed to the merits of the Petition.

III. Discussion

A. The Petitioner's Claim that he was Convicted of Violating an Over-Broad Prison Regulation. This contention involves the Petitioner's request for an Evidentiary Hearing, in order to "develop the basis of his claim," that he was disciplined under a Regulation that is unconstitutionally vague. See, Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus, at 26. Notably, the Petitioner does not dispute that his behavior was aptly described in the DHO's Report, for he only quarrels with the notice that was provided to him, by the prison officials, that his conduct was prohibited.

1. Standard of Review. The Petitioner contends that the Regulation that he is alleged to have violated -- Receiving Anything of Value From Another Inmate -- as applied to him in this context, was vague, and failed to provide him with notice that his behavior was sanctionable. "It is axiomatic that due process requires fair notice of prohibited conduct before a sanction can be

imposed." Williams v. Nix, 1 F.3d 712, 716 (8th Cir. 1993), citing Coffman v. Trickey, 884 F.2d 1057, 1060 (8th Cir. 1989), cert. denied, 494 U.S. 1056 (1990); Brouie v. City of Columbia, 378 U.S. 347, 350-51 (1964). This principle applies within the prison setting. See, Coffman v. Trickey, supra, citing Gibbs v. King, 779 F.2d 1040, 1044 (5th Cir. 1986), cert. denied 476 U.S. 1117 (1986) (An inmate is entitled to prior notice, or fair warning, of proscribed conduct before a sanction may be imposed); see also, Newell v. Sauser, 79 F.3d 115, 117 (9th Cir. 1996)("[i]t is clearly established, both by common sense and precedent, that due process requires fair notice of what conduct is prohibited before a sanction can be imposed").

"Consequently, in order to comply with the dictates of the Due Process Clause, a prison regulation must provide fair notice of what is prohibited before a sanction can be imposed." Murphy v. Shaw, 195 F.3d 1121, 1128 (9th Cir. 1999)(citations omitted). As the Supreme Court stated in Grayned v. City of Rockford, 408 U.S. 104, 108 (1972), "because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."

2. Legal Analysis. Here, we are called upon to consider whether the vagueness of the "Receiving Anything of Value

From Another Inmate" prohibition, as applied to the conduct of the Petitioner, prevented him from obtaining adequate notice that his conduct was proscribed. The pertinent BOP Regulation prohibits "Receiving Anything of Value From Another Inmate," and the Record demonstrates that, on several occasions, the Petitioner utilized the phone access code number of Ward, and Iparraguirre -- who are his fellow inmates -- to place direct-dialed telephone calls. See, Buege Dec., at ¶ 5; Petitioner's Appendix, at A11. As such, it is clear that the Petitioner violated BOP Regulations, when he spoke on the telephone using the access codes of his fellow prisoners, because the phone calls resulted in charges being placed on his fellow prisoners' telephone accounts, when those charges would have otherwise been assessed to the Petitioner.[9] See, Petitioner's Appendix, at A11.

Although the Petitioner argues that he was unaware that his conduct was prohibited, the Record demonstrates otherwise. At the Petitioner's Disciplinary Hearing, the DHO took administrative notice that the Petitioner's Admissions and Orientation Program Checklist contained an acknowledgment, by the Petitioner, that he

[9]Our Court of Appeals has previously determined that prison Regulations, which prohibit "accepting * * * anything of value from another person," are clear, in that they prohibit a prisoner from receiving anything that holds value. See, Williams v. Nix, 1 F.3d 712, 716 (8th Cir. 1993)(upholding sanction upon prisoner for exchanging pre-stamped envelopes).

received briefings regarding telephone access codes. See, Petitioner's Appendix, at A11.[10] Also, the DHO reported that, during those briefings, BOP staff member Leroy McRae verbally advised the Petitioner that compromising telephone access could result in disciplinary action. Id.

Further, at the Hearing, the Petitioner admitted that he was aware of the Regulations prohibiting the transfer of phone access codes.[11] Specifically, the Petitioner stated:

> Yes, I did sign a document that says I can't give up my phone access code (PAC) number but they [(Ward and Iparraguirre)] keyed in their PAC numbers for me and I used their phone.

Petitioner's Appendix, at A9.

---

[10]The Petitioner contends that he did not receive these briefings until March 2, 1999, and therefore, that he did not have knowledge that his telephone conduct was prohibited, until after the calls were made. However, the Record shows that one of the phone conversations, which provided the basis for the BOP's charges against the Petitioner, occurred on March 24, 1999, when the Petitioner placed a call using the access code of Iparraguirre. See, Petitioner's Appendix, at A10.

[11]Also, at the Hearing, the DHO took administrative notice of documentary evidence in the form of Program Statement 5264.06, which states that inmates may not possess another inmates's telephone access number, and may not provide their access codes to other inmates. See, Petitioner's Appendix, at A11. The Petitioner has not denied receiving this Program Statement, as a part of the Admission and Orientation Handbook that was provided to him, but rather, merely alleges that the Handbook fails to "directly cover [the allegedly violative] type of calling practice." Petitioner's Memorandum, at 7.

This statement reveals that the Petitioner was aware of the prohibition against the transfer of phone access codes and, therefore, his purported belief that he could avoid this Regulation, by simply instructing his fellow prisoner's to key in their phone access codes for his phone calls, is not plausible.

In our view, the Petitioner has failed to present any evidence to suggest that a reasonable prisoner would not have been aware that the use of a fellow prisoner's phone access code -- either by having knowledge of the code and using it for their personal phone use, or by placing calls after the code was keyed in by fellow prisoners -- was prohibited. Rather, the Petitioner's direct testimony, and his acknowledgment of his receipt of briefings, and information, about the telephone access code Regulations, and the prohibition against compromising telephone access codes, supports a determination that the Petitioner was provided with adequate notice that his conduct was prohibited. Therefore, we conclude that this aspect of the Petitioner's Petition is without merit, and should be dismissed.

B. The Petitioner's Claim that his Due Process Rights were violated at the DHO Hearing. According to the Petitioner, although he requested that staff members Steele, or Bufford, be appointed to present his vagueness defense to the DHO, the Respondent appointed staff member Porter instead, and thereby deprived him of a mean-

ingful opportunity to be heard on this defense, in violation of the Due Process Clause of the Fifth Amendment.

1. Standard of Review. The Fifth Amendment prohibits the Federal Government from depriving a person of life, liberty, or property, without due process of law. While it is true that the constitutional protections, that are encompassed by the due process clause, do not abate at the time of imprisonment, Hudson v. Palmer, 468 U.S. 517, 539 (1984)(O'Connor, J., concurring), it is also true that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Sandin v. Conner, 515 U.S. 472, 485 (1995), quoting Jones v. North Carolina Prisoners Labor Union, 433 U.S. 119, 125 (1977), quoting, in turn, Price v. Johnston, 334 U.S. 266, 285 (1948).

Although prison disciplinary proceedings often implicate liberty interests, they are not criminal Trials and, therefore, they do not involve the full panoply of procedural and substantive protections that are available in criminal proceedings. Wolff v. McDonnell, 418 U.S. 539, 567-68 (1974). Consequently, in the context of prison disciplinary proceedings, an inmate's Due Process rights are not infringed provided that, before being disciplined, the inmate receives: (1) advance written notice of the charges; (2) an opportunity to present evidence in his defense; (3) a written

statement by the fact finder of the reasons for the action; and (4) a decision supported by some evidence in the Record. Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 454 (1985), citing Wolff v. McDonnell, supra at 563-67; see also, Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997).

2. Legal Analysis. As a review of the Record plainly shows, each of the safeguards, that we have identified above, were scrupulously honored by the BOP and, therefore, the Petitioner cannot maintain a viable Due Process challenge to the processes which resulted in the discipline at issue.[12] Moreover, as a variety of

---

[12]The Record demonstrates that the Petitioner received over twenty-four hours of advanced written notice of the charges that were leveled against him, prior to the Disciplinary Hearing. See, Petitioner's Appendix, at A7. As well, the Record reveals that, during the Hearing, the Petitioner requested that several witnesses testify, and that, as a result of that request, the testimony of those witnesses was elicited. Id. at A9-A10. Finally, the Record reflects that a written statement was provided to the Petitioner, by the DHO, outlining the reasons for the action and, as described previously, the Petitioner has admitted to participating in the alleged transgressions, thereby producing "some evidence" of his guilt. Id. at A10-A13.

Primarily, however, the Petitioner's complaint involves his representation, by prison staff member Porter, who was also a member of the F.C.I. Eglin Disciplinary Committee. According to the Petitioner, because his requested staff representative was not appointed to assist him, he was unable to adequately present his vagueness defense. While we agree with the Petitioner, that the representation he received was in direct conflict with BOP Regulations, see, Petitioner's Appendix, at A34 & A36, this procedural error does not rise to the level of a deprivation of Due Process. Rather, the Record demonstrates that staff member Porter assisted (continued...)

controlling authorities hold, the Plaintiff's resulting, suspended fourteen day segregation sentence, and disciplinary transfer, were not the sort of atypical, or significant hardship, which implicates Due Process.

As the Supreme Court has explained, recognized prisoner Due Process liberty interests are constrained to those incidents which, "while not exceeding the sentence in such an unexpected manner as to give rise to the Due Process Clause of its own force * * *, nonetheless impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, supra at 486. Therefore, while some prison deprivations do serve to create liberty interests, they are confined to those instances "which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." Moorman v. Thalacker, 83 F.3d 970, 972 (8th Cir. 1996), citing Sandin v. Conner, supra at 482-84.

---

[12](...continued) the Petitioner in presenting a defense, and that the DHO's decision was supported by credible evidence. Further, the Record reflects that the Petitioner's argument, that he had no notice that his conduct was prohibited, was presented to, and considered by, the DHO. See, Petitioner's Appendix, at A12. As such, the Petitioner's assertion, that his Due Process rights were violated by the purported failure to have been afforded an opportunity to present a meaningful defense, is without merit.

Under this analytical framework, it is now well-settled that an inmate's brief placement in a form of institutional segregation does not constitute the sort of "atypical or significant hardship" which gives rise to a prisoner liberty interest. See, e.g., Sandin v. Conner, supra at 486 (thirty days of disciplinary segregation); Freitas v. Ault, 109 F.3d 1335, 1337 (8th Cir. 1997)(ten days of administrative detention followed by thirty days of "on-call" status); Kennedy v. Blankenship, 100 F.3d 640, 642-43 (8th Cir. 1996)(thirty days of "punitive isolation"); Wycoff v. Nichols, 94 F.3d 1187, 1188 (8th Cir. 1996)(ten days of disciplinary detention and one hundred days in maximum security cell); Moorman v. Thalacker, supra at 971 (fifteen days of highest-level disciplinary detention, followed by one-hundred-and-seven days of less restrictive detention).

Further, it is well-settled that Federal prisoners do not have a liberty interest in being incarcerated within any particular facility operated by the BOP and, as a result, the Attorney General retains the discretion to transfer prisoners from one place of confinement to another at any time. See, Title 18 U.S.C. §4082(b); Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976); cf., Meachum v. Fano, 427 U.S. 215 (1976)(the interest of a prisoner in avoiding an intrastate prison transfer is "too ephemeral and insubstantial to trigger procedural due process protections as long as prison offi-

cials have discretion to transfer him for whatever reason or for no reason at all"); Olim v. Wakinekona, 461 U.S. 238, 248 (1983)(an interstate prison transfer does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself); Moorman v. Thalacker, supra at 972 (Discretionary transfer of prisoner to medium security prison was not disruption exceeding ordinary incidents of prison life and, thus, did not implicate Due Process liberty interest).

Given these authorities, it is evident that the Petitioner's Due Process rights were not violated at the BOP Disciplinary Hearing and, therefore, there is no basis upon which to grant the Petitioner's request for an Evidentiary Hearing. See, Poole v. United States, 438 F.2d 325, 326 (8th Cir. 1971)(no Evidentiary Hearing needed when Hearing would serve no useful purpose).

C. The Petitioner's claim that BOP officials retaliated against him for exercising his constitutional rights, by seeking a disciplinary transfer. According to the Petitioner, the primary motivation for his disciplinary transfer was the desire of prison staff to retaliate against him because he was exonerated in January of 1999, of "Being in an Unauthorized Area, Code 316," and with "Introduction/Possession of Non-Hazardous Contraband, Code 331." As such, the Plaintiff has alleged that his transfer from F.P.C.

Eglin, to F.C.I. Sandstone, was in retaliation for the exercise of his constitutional right to Due Process.

1. Standard of Review. Of course, a prisoner may not be disciplined in retaliation for his exercise of a constitutional right. See, Sisneros v. Nix, 95 F.3d 749, 751 (8th Cir. 1996); Cornell v. Woods, 69 F.3d 1383, 1387-88 (8th Cir. 1995); Goff v. Burton, 7 F.3d 734, 736-37 (8th Cir. 1994), cert. denied, 512 U.S. 1209 (1994); Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir. 1991). Nevertheless, to successfully prosecute a retaliation claim, the prisoner must "'face a substantial burden in attempting to prove that the actual motivating factor for [the discipline]' was the impermissible retaliation." Goff v. Burton, supra at 737, quoting Murphy v. Missouri Dep't. of Correction, 769 F.2d 502, 503 n. 1 (8th Cir. 1985); see also, Sisneros v. Nix, supra at 752. This standard has been characterized as a "but for" test, Sisneros v. Nix, supra; Goff v. Burton, supra at 737; Ponchik v. Bogan, supra at 420, and the burden placed upon the prisoner, by this standard, is a heavy one. Thus, "[t]o prevail on his retaliation claim, [the prisoner] has the concededly heavy burden of showing that the prison officials who disciplined him had an impermissible motive for doing so, and that but for this impermissible motive, the disciplinary charges would not have been brought." Orebaugh v. Caspari,

910 F.2d 526, 529 (8th Cir. 1990)(Heaney, J., concurring and dissenting).

2. Legal Analysis. Here, upon the Record presented, we find that the Petitioner has failed to demonstrate that he would not have been transferred to F.C.I. Sandstone "but for" his exercise of his right to Due Process. Rather, the Record amply substantiates that the Plaintiff's transfer was an appropriate exercise of institutional discipline. For example, at the Petitioner's Discipline Hearing, prison staff testified that inmate compliance with the telephone regulations was "paramount in maintaining appropriate security procedures within [the] * * * correctional facility." Petitioner's Appendix, at A13. Further, in the DHO's reasons for recommending a transfer of the Petitioner, he explicitly stated that the Petitioner's "prohibited act * * * indicates behavior problems that he is in need [sic] of more structure and control than normally afforded in an open camp environment." Id. at A13.

It is well-settled that lawful incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Jones v. North Carolina Prisoners Labor Union, 433 U.S. 119, 125 (1977), quoting Price v. Johnston, 334 U.S. 266, 285 (1948). Accordingly, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters

of the sentence imposed by a court of law." Sandin v. Conner, supra at 485. As our Court of Appeals has recently observed, "inmate claims of unlawful retaliation must be treated with skepticism because '[e]very act of discipline * * * is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" Sisneros v. Nix, supra, quoting Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996)(en banc). Here, the Petitioner has offered no evidence, other than bald, unsupported accusations, to overcome our "skepticism" concerning his allegation, that the Respondent has engaged in retaliation.

We do not mean to suggest that the circumstances of the Petitioner's confinement have not been -- at least to some extent -- adversely affected by his transfer to a prison facility which operates under a higher designation of security than his former place of incarceration, but it is axiomatic that, in the absence of a competent showing of retaliatory animus, "a prisoner enjoys no constitutional right to remain in a particular institution * * *." Goff v. Burton, supra, quoting Murphy v. Missouri Dep't. of Correction, supra at 503. Indeed, prison officials may ordinarily transfer a prisoner "for whatever reason or for no reason at all * * *." Id., quoting Olim v. Wakinekona, 461 U.S. 238, 250 (1983). Here, our review focuses upon the extent to which, if at all, the Petitioner's transfer was the result of a purportedly retaliatory

motivation, and we find no basis upon which to conclude that his discipline, in any appreciable way, deviated from "the expected parameters of the sentence imposed by a court of law." Sandin v. Conner, supra at 485. Therefore, this aspect of the Petitioner's Petition should be dismissed. See, e.g., United States v. Johnson, 751 F.2d 291, 194 (8th Cir. 1984), cert. denied, 471 U.S. 1126 (1985)(Evidentiary Hearing unnecessary when petitioner is not entitled to relief).

4. The Petitioner's Equal Protection Claim. According to the Petitioner, the Respondent deviated from its own institutional Regulations, and thereby treated him differently from other prisoners, when determining his custody level assignments and security management variables, and when it placed a Central Inmate Monitoring Assignment Separation Order in his inmate file, in violation of the Equal Protection Clause of the Fourteenth Amendment. However, because these allegations, if proven, would fail to constitute a deprivation of any constitutional rights, privileges or immunities, to which the Petitioner is entitled, we have no jurisdiction to review these claims.

As we have previously observed, it is well-established that Federal prisoners do not have a liberty interest in an incarceration within any particular facility operated by the BOP and, as a result, the Attorney General retains the discretion to transfer

prisoners from one place of confinement to another at any time. See, Title 18 U.S.C. §4082(b); Moody v. Daggett, supra at 88 n. 9; cf., Meachum v. Fano, supra at 215 (State prisoners). As for transfers within a prison, based upon security classifications, these decisions, too, are exclusively within the discretion of BOP officials, as Congress has given Federal prison officials full discretion to control the conditions of prisoner confinement. See, Title 18 U.S.C. §4081; Moody v. Daggett, supra; Peck v. Hoff, 660 F.2d 371, 373 (8th Cir. 1981).

Prison officials have discretion to implement legitimate penological interests in segregating individual inmates, from the general prison population, for non-punitive reasons in instances where, such as here, there is a threat to the safety and security of the institution. Brown-El v. Delo, 969 F.2d 644, 647 (8th Cir. 1992); Frazier v. Dubois, 922 F.2d 560, 562 (10th Cir. 1990). As such, a Federal prisoner does not have a substantive due process, equal protection, or any other constitutional or statutory right, to a particular custody or security classification. See, Moody v. Daggett, supra; United States v. Mauro, 436 U.S. 340, 359 (1978); Prows v. Federal Bureau of Prisons, 981 F.2d 466, 467 (10th Cir. 1992), cert. denied, 510 U.S. 830 (1993); United States v. Laughlin, 933 F.2d 786, 789 (9th Cir. 1991).

Here, the basis for this aspect of the Petitioner's constitutional claim involves his contention that the Respondent failed to strictly follow its own guidelines, and Regulations, when determining his security classification, and custody level. Further, the Petitioner contends that these inaccurate determinations ultimately resulted in his placement in an institution with a higher level of security than that which he feels is necessary. However, the Petitioner must show some deprivation of his constitutional rights, privileges, or immunities, to which he is entitled, before we may rule on these prisoner status classifications and, as we have noted, under the governing law, the Petitioner has no substantive Due Process, or Equal Protection right, to a particular custody or security classification within the Bureau of Prisons. United States v. Mauro, supra at 359; Moody v. Daggett, supra. Accordingly, in the absence of the requisite jurisdiction, this aspect of the Petition for a Writ of Habeas Corpus should be denied.

In sum, finding no basis upon which to grant the Petitioner's request for Habeas relief, the same should be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Petition for a Writ of Habeas Corpus [Docket No. 1] be summarily dismissed.

2. That the Motion of the Petitioner for an Expansion of the Record [Docket 6] be DENIED, as moot.

3. That the Motion of the Petitioner for an Expansion of the Record [Docket 10], be DENIED, as moot.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 7, 2000**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 7, 2000**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C.

§636 to review the transcript in order to resolve all of the objections made.